NEW YORK CENTRAL RAILROAD COMPANY et al., Appellants, *v.* NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY, Respondent.

First Department, June 22, 1961.

*Thomas F. Daly* of counsel (*Garrard W. Glenn, Saul L. Sherman* and *James C. Goodale* with him on the brief; *Lord, Day & Lord,* attorneys), for appellants.

*David W. Peck* of counsel (*Henry N. Ess, III,* and *William R. Luney* with him on the brief; *Levien, Steinbrink & Beaudet,* attorneys), for respondent.

RABIN, J. Broadly stated, we are asked to define the rights of the New Haven Railroad and those of New York Central Railroad with respect to the operation of the Biltmore Hotel. New Haven claims that it has an equal voice in the management of that property whereas it is the claim of Central that its position with respect to control is a dominant one. Central asserts that the only right New Haven has is to join in any of the decisions unilaterally made by Central with respect to the maintenance and leasing of the property and that failing to do so New Haven would lose whatever rights it had in the hotel and in any of the income derived therefrom.

The issue was raised when New Haven refused to join in a lease of the Biltmore Hotel, unilaterally prepared and signed by Central on December 8, 1958. Following such refusal Central commenced this action pursuant to article 15 of the Real Property Law in which it seeks to have the respective rights of the railroads determined. New Haven through its counterclaims seeks similar relief. Both parties agree that their rights may be determined from the written documents and, accordingly, each moved for summary judgment in its favor. Special Term granted the motion made by New Haven and entered a judgment which essentially established New Haven's right to an equality of control with that of Central and provided for injunctive relief in favor of New Haven and dismissed Central's complaint. It is from this judgment that Central appeals.

A brief summary of the facts follows:

In 1848 New Haven acquired the right to use, jointly with Central or its predecessors, the tracks running into New York City. The fee to the properties used in this railroad operation was in Central or its predecessors. In 1903 and 1904, through

legislative enactment, the further use of steam locomotives was prohibited and it was required that the tracks along Park Avenue be depressed below street level. This, in turn, required that new depot facilities be erected. At that time Central took the position that it alone could proceed to erect a new depot as it saw fit and that New Haven would have no right to its use absent Central's consent. New Haven took a contrary view. The differences between the parties were submitted to George W. Wickersham for resolution. That dispute was resolved in favor of New Haven. Subsequent thereto, and in 1907, New Haven and Central entered into an agreement, the object of which was to arrange for the joint use by New Haven and Central of the trackage and the proposed new terminal. By that document Central agreed to furnish the land and erect the terminal. In consideration therefor New Haven agreed to pay to Central annually its proportion of interest at the rate of $4\frac{1}{4}\%$ on the cost of the land and the construction of the new terminal in addition to other amounts fixed by the agreement. It also agreed to pay, among other things, its proportionate share of the cost of maintaining and operating the terminal properties. By that agreement Central leased to New Haven during the term of New Haven's charter and all renewals thereof " the use, in common with the Central Company * * * of the said Railroad Terminal for the accommodation of the traffic of the New Haven Company ''. The railroad terminal was defined to include " the land, and interests in land, and all improvements thereon * * * and all rights in any ways on which said land may abut ''.* Provision was made in that agreement for the establishment of a so-called " Terminal Account '' into which all rentals (not belonging exclusively to either party) received from the use of any part of the terminal was to be deposited for the eventual benefit of both New Haven and Central, it being provided that such sums were to be applied to defray the cost of the maintenance and operation of the terminal. The amount which New Haven was to pay for the use of the terminal facilities depended on the percentage of use it made of the terminal facilities after credit had been given for the amounts deposited in the Terminal Account.

Subsequently the parties perceived the possibility of using the surface above the tracks for the construction of buildings. Commencing in 1910 they joined in the financing and construction of buildings and over the next 20 years about 18 buildings were so erected. In 1912 an agreement was entered into between

---

* The Biltmore Hotel was erected on the lands designated.

Central and New Haven for the construction of the Biltmore Hotel. Simultaneously an agreement was made for the leasing of the property to a third party, Central and the New Haven being designated in such leasing agreement as lessors. The cost of the construction of the hotel amounted to about $5,600,000, and to that cost of construction New Haven, as it was obligated to do, contributed equally with Central.

In 1913 Central and New Haven entered into the agreement which contains the clause which we are called upon to construe. The preamble to that agreement stated that it was made " to express more fully the intent of the parties " with respect to the construction, maintenance and use of the buildings contemplated to be built pursuant thereto and with respect to the rentals accruing from the leasing of such buildings. The 1913 agreement was expressly made a part of the 1907 agreement, the provision being that the words of the 1913 agreement " be added at the end of paragraph 3 " of the 1907 agreement. The provision of the 1913 agreement which must be construed in order to determine the issue in controversy is as follows: " It is understood and agreed that the use of the Railroad Terminal demised by this paragraph to the New Haven Company shall include the right on the part of the New Haven Company to join with the Central Company, in accordance with agreements relating thereto, made, or from time to time to be made, by and between the Central Company and the New Haven Company, in the construction, holding, maintenance and leasing of buildings, or parts thereof (other than such buildings or parts thereof as form a part of the Railroad Terminal to be constructed by the Central Company as hereinafter provided) upon the land included within the Railroad Terminal. In every such building, together with the right to support thereof, toward the construction of which the New Haven Company shall furnish or contribute money, and until it is reimbursed therefor, the New Haven Company shall have and own an undivided interest which shall bear the same proportion to the entire building as the amount of money furnished or contributed by the New Haven Company, and for which it has not been reimbursed, bears from time to time to the entire cost of the construction of such building. At the time when the New Haven Company shall be fully reimbursed for all moneys furnished or contributed by it for or toward the construction of any such building, with interest at such rate as shall have been agreed upon, such undivided interest of the New Haven Company shall cease. In all cases in which the New Haven Company and the Central Company shall join in the construction of any such building or buildings, the

rentals to be credited to the fixed charges or to the cost of maintenance and operation of the Railroad Terminal under the provisions of Paragraph 14 of this agreement shall include all rentals accruing from the leases of the buildings or parts of buildings so constructed, except such rentals as by agreement between the New Haven Company and the Central Company shall be paid over to the New Haven Company and the Central Company or either of them as a proper return for the moneys advanced by such party to provide for the construction of any said buildings. It is expressly understood and agreed that, to facilitate the raising of money for the construction of such buildings, any rights of the New Haven Company or of the Central Company in such buildings or any of them or any parts thereof and in or to any rentals accruing from the lease of such buildings or any of them or any parts thereof, may be, by agreement between the Central Company and New Haven Company, at any time hereafter, conveyed, assigned or pledged to one or more corporations, associations or trustees.''

Subsequent to the construction of the Biltmore, the third-party tenant entered into possession and continued in possession until 1934 when it defaulted. In consequence of such default it surrendered possession to both New Haven and Central and at the time of such surrender the name '' Biltmore '' and the furniture, furnishings and equipment of the hotel were conveyed jointly to Central and New Haven. Thereafter, the Biltmore was operated for the benefit of both Central and New Haven through a subsidiary corporation wholly owned by Central to which a one-year lease was given by New Haven and Central as joint lessors. That lease by its terms was renewable from year to year and was renewed until December 8, 1958, at which time Central unilaterally gave to that subsidiary a five-year lease in which it asked New Haven to join. New Haven refused, claiming Central had no right to execute a lease unilaterally but that a lease to the Biltmore could only be made through the joint co-operation of New Haven and Central inasmuch as New Haven was entitled to an equal voice with Central in the management and leasing of the properties.

It should be here stated that the advances for the construction of the Biltmore, made by both Central and New Haven, had been fully repaid in 1957 and that under the terms of the 1913 agreement, upon such repayment to New Haven, its '' undivided interest '' in the building as such '' shall cease ''. However, despite that provision the parties agree that New Haven's rights — whatever they may be — with respect to '' holding, maintenance and leasing '' of the building did not cease; that such

rights continued beyond the period of repayment; that the net profit from the operation of the building would still be deposited in the Terminal Account for the benefit of both parties. Indeed, Central continued to deposit the net profits of the building operation into the Terminal Account even though both parties had received repayment of their investment with interest. It was not until the refusal of New Haven to join in the 1958 lease that Central took the position that all of New Haven's rights in the hotel and the income from the hotel were forfeited. The present lawsuit was the consequence of that position taken by Central.

In this action Central seeks to have the court declare its position to be dominant to that of New Haven and that the lease made by it unilaterally in 1958 is a valid one. It further seeks a declaration to the effect that by reason of New Haven's failure to join in that lease it forfeited any interest in the Biltmore Hotel or in the income derived therefrom. On the other hand New Haven seeks a declaration that it has an equal right in the control and management of the Biltmore Hotel and that in consequence no lease signed by Central unilaterally — and particularly over New Haven's objection — can be valid.

Special Term concluded that the position of New Haven was the correct one and the judgment embodying such view is before us for review.

I believe that the decision of Special Term is essentially correct. I come to the conclusion that New Haven has a right to share in the control and management of the Hotel Biltmore — a right equal to that claimed by Central. I believe that Central can no more compel the New Haven — as a condition to its retaining its interest in the Biltmore — to sign a lease unilaterally prepared by Central than New Haven could compel Central to sign a lease unilaterally prepared by it. Nor does it make any difference that the lease tendered is a good one. Certainly, New Haven cannot compel Central to sign a lease unilaterally prepared by it — even a most desirable one. In consequence, believing as I do that the rights in that respect are equal, I conclude that Central may not compel New Haven to do so.

While I could very well rest on the carefully considered opinion of Special Term, I deem it best to advance some of the reasons for reaching my conclusion.

We need go no further than to examine the 1913 agreement to find that the rights claimed by New Haven — and they are not unusual for one that advanced 50% of the cost of construction — were granted to it in what I consider to be plain, simple

and clear language. That agreement provides that the New Haven Company may not only join in the construction of the building, but may also join in the " holding, maintenance and leasing " of the building. If we are to give any meaning to that language we can only construe it to mean that New Haven has a right to participate in the holding, maintenance and leasing of the building. How, for example, can anyone join in the maintenance of a building if he has nothing to say as to how it is to be maintained? It seems to me that Central is claiming unusual rights when it claims the right to control the operation of the Biltmore to the exclusion of New Haven. And, I fail to find any language in the 1913 document or any other document which gives the Central that right.

While I think that the conclusion I reach can clearly be gathered from the language of the 1913 document alone, yet reading it in the light of the 1907 and the 1912 agreements and having in mind the relationship between the parties theretofore existing, such conclusion becomes even more clear.

Whatever rights New Haven has were not newly created by the 1913 document. New Haven did not come to the negotiation table in 1913 empty-handed looking for an opportunity to join in the development of the railroad terminal properties as a gratuity. The rights of New Haven in the Biltmore had already been established by the contract between it and Central, signed in 1912. There is nothing in the 1912 agreement, or in the documents jointly signed by Central and New Haven on the same day with their prospective tenant, that even suggests that Central hold a dominant position. On the contrary, throughout they seem to point to equal rights and equal responsibilities. Notably the 1912 agreement provides that not only shall the cost of construction be borne equally but that should structural changes be required subsequently, each party would bear one half of the cost of such structural changes.

Nor was the joinder by New Haven with Central in the 1912 instruments the result of a benefit gratuitously bestowed upon New Haven by Central. New Haven was in the Biltmore project as a matter of right — a right arising out of its interests in the railroad terminal property acquired by the 1907 agreement, for the good and valuable considerations therein set forth. What rights did the 1907 agreement give to New Haven with respect to the " Railroad Terminal " within the limits of which the Biltmore was built? It should be noted that the words " Railroad Terminal " are defined to mean the " land and interests in land " and also " all improvements thereon ". The 1907

instrument gave to New Haven the use of the railroad terminal " in common " with the Central Company. " [I]n common " were the words used — not subservient to Central; " in common " and not with Central as the dominant partner. Implicit in the words " in common " is that New Haven had the right to the use of the lands " and all improvements thereon " on equal terms with Central.

And lest it be urged that such right to the use of the railroad terminal in common with Central be limited to properties underground, we consider the following: the 1907 agreement was written in the light of the legislative mandate that the tracks be covered and yet it gives New Haven the right to use in common with Central not only the land but also " all improvements thereon "; it was written with the parties knowing of the opinion of George W. Wickersham, who, at the instance of the parties, had defined their. rights and established among other things New Haven's depot rights, indicating that railroading requires use of land over as well as under the ground; the practical construction of the parties implicit in their entering into the 1912 construction agreement and jointly agreeing to and signing the necessary documents with their prospective tenant; and lastly, but significantly, the signing of the 1913 agreement which by its terms was made a part of the 1907 agreement. It might be here added that having been made a part of the 1907 agreement, the 1913 agreement should be so read. To do so we must read the word " join " together with the expressed intent of the parties that they use the properties in common. Joining in common with Central spells for New Haven an equality of control rather than a position subservient to Central.

It is apparent, therefore, that the parties did not come to the conference table in 1913 to establish new rights but rather — as stated in the 1913 preamble — to define rights already established and already acted upon. And they came to the conference table on equal terms despite the fact that Central was the owner of the fee. Its ownership had already been encumbered — encumbered by the rights of New Haven to use the terminal land " in common " with Central. Moreover, whatever advantage Central claims by reason of being the owner of the fee was neutralized by the obligation of New Haven to pay to Central and Central to receive $4\frac{1}{4}\%$ of its actual net expenditures in acquiring the land and for the construction of the railroad terminal. And in consequence, provision was made for a ground rent to be paid, not to Central alone, but for the

benefit of New Haven as well, through the medium of the terminal account. Ordinarily the ground rent is paid only to the owner of a fee or one who has an interest in the fee. Incidentally, that ground rent is still being credited to that account to the advantage not only of Central but of New Haven.

The actual underlying fee of the land upon which this great railroad terminal was laid out is largely a matter of only historic importance, since it is clear that it became dedicated by the fee owner to the railroad passenger terminal usages of both railroads, and all of its structures and facilities were incidental to those usages, or were created to provide income to maintain those usages. No such importance attaches to rights of the party who owns the underlying fee as might be expected in the usual leasing or licensing of land; and what is of greater importance on the intention of both parties, they had already fixed their rights in the terminal area land and in its development as being equal rights before they undertook the construction of the Biltmore or other structures or facilities incidental to the terminal passenger operation. They had, in effect, converted themselves into owners of the fee together, as far as the area of this controversy stretches.

It is clear that the development of the lands over the tracks was but another step in the joint exploitation of the railroad properties made possible by the covering of the tracks. It was an incident in the development of the railroad terminal in which each party had a joint interest — that of Central as owner of the fee and that of New Haven by virtue of its rights which, for good consideration, were carved out of the fee. Nor does the fact that New Haven ceased to have an undivided interest in the structure as such, after its investment had been returned, alter the conclusion reached. There was then no need for New Haven to have an undivided interest in the building as such. The effect of that provision was merely to merge title to the building with that of the fee. The entire fee, however, still remained and remains encumbered by the rights of New Haven. That those rights, however they may be construed, continued beyond the repayment of New Haven's investment is now conceded by Central. Had they not, Central would not have continued to credit New Haven with its share of the income from the building after the return of its principal and there would have been no point in or necessity for Central having tendered the 1958 lease to New Haven for signature as it did.

Central's position is that having failed to sign the lease unilaterally prepared by Central, New Haven failed to exercise its option to join in the "leasing" and in consequence whatever

interest New Haven had in the Biltmore was forfeited.* That position presupposes the right of Central to negotiate and close the lease to the Biltmore property without the participation or acquiescence of New Haven. That claimed right New Haven stoutly, and I believe rightly, contests. Furthermore that position wrongly assumes that when New Haven first exercised its option to join in the '' construction, holding, maintenance and leasing '' of the property by paying one half of the cost of construction no definitive rights in the property were acquired by New Haven except the right to join docilely in each of the decisions made by Central. How many times must New Haven exercise its option to join in order to retain the interest in the property originally acquired when it first exercised that option? However, Central seems to say that New Haven must continue to join and rejoin in each decision of Central because it assumed no obligation to stay joined and it is free to abandon the enterprise at will. I can find nothing in the documents that gives it that right and it seems to me that such right attributed to New Haven is a highly questionable one. There is no precedent that points to such right. When New Haven did withdraw from one project it did so only with the assent and agreement of Central.

The refusal to sign the lease tendered is no indication that New Haven has any desire to withdraw from the Biltmore — nor may such refusal constitute a withdrawal. New Haven simply contests the right of Central to compel it to sign the lease tendered as a condition of its continued interest. My dissenting colleagues very properly consider such refusal as an assertion of right and do not attach to it the consequences sought by Central.

However, Central suggests that it was not contemplated that New Haven share in rentals from a lease in which it did not join. But that statement assumes that Central's position is the correct one; that it had a right to make the lease without the approval of New Haven and that New Haven is obliged to sign it as a condition to receive its share of the proceeds derived from the property.

Upon argument Central compared the position of New Haven to that of a minority stockholder. The comparison could be considered an accurate one if Central were correct in its contention. But such comparison does not help solve the problem presented because it assumes that New Haven has no right to a voice in the control of the properties — the very question we

---

* It certainly did not forfeit New Haven's equal right to the name "Biltmore" or its right to a 50% interest in the personal property acquired by it jointly with Central from their former tenant upon the occasion of that tenant's default.

are called upon to resolve. It must be observed, however, that a minority stockholder is not usually invited or permitted to join in the operation and maintenance of corporate properties — certainly not in common with those in control. I believe that a more accurate description of New Haven's position, if we wish to consider it in corporate terms, would be that of one holding stock in an amount sufficient to give it equality in control. A still better description of New Haven's position would be that of a partner.

It is urged that the parties could not have intended to give to New Haven an equal voice in the "holding, maintenance and leasing" of the Biltmore, despite the language of the 1913 agreement, for to so construe that document would put the Central at the mercy of New Haven. However, to construe it as Central would have it construed would to an even greater extent put New Haven at the mercy of Central. I do not think that the parties intended to do either. The documents spell out an equality of control.

There is nothing unusual in parties engaging in joint ventures with an equality of control. On the contrary, such arrangements are quite common. Great industrial and financial dynasties have been controlled by partnerships. Indeed, corporations are regularly organized in a manner that would result in joint and equal control by the incorporating parties.

Of course, it would have greatly facilitated the operation of the terminal properties and the Biltmore Hotel, of which it was a part, if one of the parties were empowered to make the decisions, which the other would be obliged to accept. But unless the parties so expressly provide, it is not for the court to set up a dominant party. The parties, of course, could have done so but the documents will be searched in vain for any evidence that they did do so.

We are told that the parties could not have intended an equality of control because the companies would be subjected to deadlocks, without any provision having been made to resolve them. However, the parties did envision a possible deadlock (which could only occur if both parties had equal control) and they did attempt to provide the means by which such impasse could be surmounted. That attempt was expressed in the arbitration clause contained in the 1907 agreement and which applied with like force to the 1913 agreement which became a part thereof. By that clause it was agreed that in the event of a disagreement with respect to the rights and obligations of the parties to the documents, or if the parties "are unable to agree as to any matter which is left to their determination" the sub-

ject matters shall be submitted to three arbitrators who " shall decide with all reasonable despatch the issues before them." Thus it is apparent that a deadlock, resulting from equal control, was foreseen and that provision was made which was considered sufficient to resolve such deadlock. It has been suggested that the agreement to arbitrate might not be enforcible. That is of no consequence nor is the fact that the arbitration clause might not have the effect intended by the parties of any consequence. Its importance in the resolution of the problem before us is that it points to the intention of the parties. If New Haven were merely obliged to accept decisions. made unilaterally by Central, what was the necessity for this arbitration clause? If New Haven was to have no voice in the management of the property, what would be the necessity for this arbitration clause? If we are to construe their relationship as giving Central a dominant position, what would be the necessity for this arbitration clause? There could be no deadlocks and there would be no disputes between the parties necessitating resort to arbitration. The arbitration clause — regardless of its effectiveness — points directly to the intention of the parties and that was equality of control.

Consequently, I believe that the basic determination of Special Term that New Haven has an equal voice with Central with respect to the control, maintenance and leasing of the Biltmore is a correct one and it need not sign the 1958 lease tendered to it by Central for signature nor does its refusal to do so result in a forfeiture of any of its rights. I, therefore, agree with Special Term that the lease entered into by Central with its subsidiary in 1958 is invalid. I would affirm the judgment of Special Term with the exception of that portion which orders the removal forthwith of all the subtenants now occupying the Biltmore Hotel. I think it was not within the power of the court to order such removal because such subtenants were not made parties to the action and were not before the court. New Haven, however, should be permitted to apply at the foot of the judgment for such relief it might deem proper in the circumstances if so advised.

Accordingly, the judgment in favor of the defendant should be modified, on the law, by striking therefrom so much of the fifth decretal paragraph as directs the forthwith removal of those claiming under Realty; and by granting leave to the defendant to apply at the foot of the judgment, if so advised, for such relief as it might deem proper in the circumstances; and as so modified, the judgment should be affirmed, without costs.

BREITEL, J. (dissenting in part). Involved is the interpretation of a 1913 modification of a written agreement made in 1907 between the New York Central and the New Haven railroads. The modification concerned the construction and exploitation of buildings to be erected over covered railroad trackage under Park Avenue in New York City. Specifically, New Haven claims the right to share equally in the control and management of such buildings. New York Central, on the other hand, contends that, while New Haven has the right to share in certain respects in surplus rents accruing from such buildings, it is not entitled to share in their control and management.

For reasons to be discussed, the judgment should be modified, but not in the manner determined by this court.

Under the 1913 modification and the 1907 basic agreement New Haven had the right " to join " with Central in the " construction, holding, maintenance and leasing of buildings ", under separate agreements to be made from time to time.[*] By advancing moneys for such construction New Haven would receive " an undivided interest which shall bear the same proportion to the entire building as the amount of money furnished or contributed ". The agreement provided that in such case rentals were to be used for repayment of advances, together with interest, and the excess was to be credited to a terminal account. The terminal account was one under which, after balancing income and expenses, the rental New Haven had to pay for trackage and terminal facilities was in proportion to its actual use of the jointly-used facilities. The 1907 agreement also provided that New Haven might use up to 50% of the facilities. In fact, it now uses 40%. This " use in common " (to which this court attaches such significance) was to accommodate New Haven's railroad operations and the percentage of its use was measured by the volume of such operations. It was not related to properties having no direct connection with railroad business.

It was further provided that after all advances were repaid New Haven's undivided interest in the buildings would cease. In every instance, however, where New Haven joined in the construction of the buildings the surplus rentals thereafter were to continue to be deposited to the terminal account, still as a credit toward the cost of the railroad facilities, thereby decreasing the rental charges for which New Haven would be liable.

Until the depression years of the mid-thirties the Hotel Biltmore, the only building directly involved on this appeal, was

---

[*] Such agreements were made and, although the parties refer to them but slightly, they are quite significant and will be mentioned in greater detail later.

occupied by a rent-paying tenant under a lease made by Central and New Haven as lessors. In 1934 the hotel tenant defaulted, and New Haven itself was in reorganization under the bankruptcy statutes. At that time the coplaintiff, Realty Hotels, Inc., was organized by Central as its subsidiary. Central owned all the stock, but the New Haven was represented on the board of directors and, significantly, Central did not numerically dominate the board. New Haven's representation was, however, never equal to that of Central, except for a brief accidental interval. The railroads thereupon leased the hotel to the subsidiary. Since then until the present, under the original lease and renewals, the subsidiary has operated the hotel and paid the rentals.

By 1957 the construction advances had been fully repaid, and, consequently, New Haven's " undivided interest in the building " ceased. The then current lease for the hotel expired in 1958. New Haven, under new management, refused to join in a new proposed lease presented by Central. Instead, it asserted the right to share equally in management and control of the hotel, claiming under the 1913 modification.* Central denied that New Haven had such right, except, of course, where New Haven joins in a lease and to the extent that it is a joint " lessor " it has some voice. Central contended, too, that by not joining in the 1958 lease New Haven would, and had, forfeited all right to benefit from surplus rentals thereafter. This lawsuit was then begun.

---

* In his affidavit, the president of New Haven stated "When I became President of New Haven in January 1956, Central nominated 5 directors to Realty's Board and New Haven nominated only 2. So long as this situation persisted, Central was able to operate the Biltmore pretty much as it saw fit. It is true that in each year annual budgets for the operation of the Biltmore were submitted to New Haven for its approval. Basically, these budgets related to the expenditures for capital purposes and important replacements and renewals; they were a far cry from affording New Haven active participation in the direction of the valuable Biltmore property. In view of New Haven's interest in the Biltmore property (the credits to the maintenance and operation account of the Terminal in the previous year, 1955, were $878,535.03), I came to the conclusion that New Haven should, in accordance with the original understanding between the railroads, receive such representation on the Board of Directors of Realty with Central so as to give New Haven an active voice in the management of the Biltmore. In addition, I caused investigations to be made respecting the operations of the Biltmore and from those investigations I concluded that the Biltmore was not being run so as to give to the railroads the maximum possible return. Based on these two considerations, I gave to Central, therefore, a clear indication that New Haven would not be interested in renewing the lease to Realty when it terminated on December 8, 1958, unless changes were made in the setup which would go at least part of the way toward meeting my objections to the then current management of the Biltmore."

On this record there is no evidence that New Haven had ever, since 1913, asserted any right to participate in the control and management of the buildings constructed over the Central trackage in Manhattan, before actually joining in the leases. It is true, however, that after the 1934 default New Haven obtained minority representation on the new lessee's board of directors. It is also true that New Haven elected not to join with respect to two buildings and, in the depression years, not to continue as to a third. Therefore, as to such buildings, it did not have, or ceased to have, any obligations or rights, even with respect to surplus rentals. In each instance had New Haven elected to join or continue it would have had to put up substantial funds.

There are other relevant details with respect to the Hotel Biltmore. Each railroad contributed equally to the construction cost of $5,600,000. The building was completed, and it was leased to a third party for a term of 21 years, with a bilateral option to renew for a further term of 21 years. As noted earlier, the lessee defaulted in 1934, before the lease had terminated. When the railroads took the building over, the tenant transferred to both railroads, as lessors, the right to the name "Biltmore" and the hotel furniture. (Of course, under the extant lease New Haven "shared control" as a lessor.)

The facts thus far discussed are not disputed. The controlling documents are accepted as such by both sides. The problem is exclusively one of interpretation.

Needless to say, failures of draftsmanship (which appear to be failures, perhaps, only in retrospect) are rarely solved by saying that the scrivener could have, and therefore would have, so provided if thus had been intended. Of course, in any case if the provisions had been clear enough, there would have been no dispute. But surely, it is a sound rationale, which one may cautiously use as a guide that a party to a document who claims unusual rights or protections must find them in the language of the document or else the omission may support the inference that such rights and protections were not intended (e.g., *President etc. of Del. & Hudson Canal Co.* v. *Pennsylvania Coal Co.*, 50 N. Y. 250, 259, compared with 272).

A principal purpose of the 1913 modification was to provide joint financing of the buildings to be constructed and, by applying surplus rentals, to reduce the costs of operating the railroad facilities. In accomplishing the foregoing result the agreement, with one qualified exception, did not purport to affect the "ownership title" of Central to the properties. Certainly, there was no express language to that effect. Moreover, in the railroad facilities, Central concededly had the exclusive owner-

ship, but New Haven had the right to use them in common with Central upon payment of a rental charge based on net costs. The exception, with respect to the surface buildings only, is that, while advances are being reimbursed, New Haven is said to have '' an undivided interest '' in the buildings in proportion to its contribution. The very least such provision establishes is a security interest in the buildings until New Haven has been repaid its advances. Notably, again, the property interest ceases on reimbursement.

Despite the fact that the property interest ceases when advances are repaid, the contractual right of New Haven to share in surplus rentals continues. This is so stated immediately after provision that the property interest ceases upon complete reimbursement of advances. It is thus clear that New Haven was, as an inducement to its participation, also granted a right, indefinite in time, to share in the profits of the building, in reduction of rentals payable for joint use of railroad facilities.

It would seem, applying the rationale earlier mentioned concerning inferences from the omission of provision for unusual rights and protections, that if it had been intended for New Haven to share in ultimate managerial control, it would have been unavoidable to have made such provision express. It is significant, too, that one deals here with early 20th century draftsmanship when ownership and title were conceived in more absolute terms than today. Hence, in such a period the draftsman was not likely to create shared controls without explicit reference to title and ownership.

The point, of course, is that the 1913 modification agreement is one that contemplates further agreements which will provide specific detail as to any other issues, including shared control, between the parties. New Haven cannot claim and need not claim a right to control from the 1913 agreement. It has the right to ask for and to receive a share in control when it is asked to '' join '' in the particular agreements relating to a building. So, it is on the Biltmore agreements * that it must rest its claim for control, not on the general 1913 modification. As will be seen later, the Biltmore agreements do not give New Haven the larger measure of control it now claims, albeit they determine quite specifically what rights New Haven has. Hence, New

---

* The Biltmore agreements are the particular documents related to the Hotel Biltmore, as distinguished from agreements covering all buildings, such as the 1913 modification. There are almost two dozen Biltmore agreements, ranging from the 1912 leases through special rental arrangements between the railroads to the final renewal agreements between the railroads and the subsidiary tenant immediately preceding 1958.

Haven has never argued its position on the basis of those agreements, which is strange, indeed. Of course, to the extent that New Haven has rights Central's " ownership " is limited. But of significance is that New Haven's rights are defined in much greater detail in the particular building agreements and are only broadly indicated in the general 1913 modification.

The New Haven, however, makes specific argument based on the language of the 1913 provision. It argues that the right " to join * * * in the construction, holding, maintenance and leasing of buildings " must mean more than merely acquiescence in following the lead of Central. It argues that the words " to join " embrace a connotation of sharing in control as joint venturers or partners would.

This argument stretches the language unduly. There were many buildings to be constructed and the ultimate cost was problematical. New Haven concededly, under the 1913 modification, had the option to participate or not to participate in the financing and the obligations of a lessor. " To join " need mean no more, and meant no more, than to so participate. Moreover, New Haven's option was to be a continuing one in the sense that it could always refuse new obligations entailed. This in fact it did with respect to one building during the depression.

The economic and legal fact is that the lessor does more than collect rents. A lessor has or may have the obligation to maintain and repair, even to replace, and sometimes, depending upon the lease, to remodel or reconstruct.* Contributions beyond the stage of initial construction may, therefore, be very large. At no time after 1913 was New Haven committed to such additional participation unless it joined in leases as well as the construction. If the roof fell in and it cost $500,000 to replace it New Haven would have no obligation unless it were bound on the lease, and it could choose not to be so bound. This is the full weight of the language " to join " in the provision and also explains why it was necessary to specify, in addition to construction, " holding, maintenance and leasing ".

New Haven also stresses that in the provision for sharing in the rentals, even after full reimbursement of advances, the condition for such rights is merely participation in the " construction " of the building without reference to " holding, maintenance and leasing ". Again, once New Haven had participated in construction its option to participate in sur-

---

* There was, in fact, provision therefor in the Biltmore lease of 1912. Mark, this was a lease executed before the 1913 modification, and one, therefore, in contemplation of the parties to that modification.

plus rentals persisted, subject, of course, to the particular building agreements that were invariably executed. But this does not mean that it may reject, at least unreasonably, continued participation in a lessor's responsibility and still be entitled to the credit of surplus rentals to the terminal account.

The railroads by their dealings since 1912 confirm the present analysis of their rights and responsibilities. In the first lease of the Hotel Biltmore New Haven and Central committed themselves not only to build the hotel but to renovate it, if necessary, at the end of the first 21-year term. The lease was renewable for a further 21-year term at the option of either the railroads or the lessee, and the railroads were obligated to renovate at a cost of up to $500,000. The exact extent of this obligation was to be determined, in the case of dispute, by submission to arbitration, as provided in detail in the lease. Thus, the railroads were fully aware of the continuing responsibilities involved in the leasing of commercial buildings at the time of the 1913 modification. By joining in the first Biltmore lease, New Haven undertook these responsibilities and could not thereafter reasonably expect to reap the benefits of the leasehold without meeting the lessor's obligations.

Significantly, New Haven's obligation to join in the cost of repair, renovation and structural change of the Biltmore was defined in the 1912 lease and did not survive the expiration of the lease or its renewal. The 1912 building agreement also confined New Haven's financial obligation for expenses to the term of the first lease and the single optional renewal. Thereafter, it could assume the burden of further expense or not, depending upon the terms of any agreement it might reach with Central regarding a division of profits accruing from such participation.

In the case of another building, 320 Park Avenue, New Haven joined in financing the construction and, by 1936, had recouped its entire investment, with interest. When Central proposed extensive renovations at an estimated cost of $900,000, New Haven was unable to contribute and declined further participation. It then relinquished all claim to future rentals, seeking to preserve only the right to join at a later date if it undertook its equitable share of the obligations as lessor.

In detailed written agreements, made upon the leasing of any building in which the railroads shared construction costs, a division of rentals was provided. In a 1936 agreement, affecting the Hotel Biltmore, this division was specified for the then current lease and any future leases made by Central and New

Haven. The prospect of New Haven sharing in rentals from a lease in which it did not join was clearly not contemplated. More importantly, neither in this nor in any other agreement or correspondence did New Haven assert any control over the development and leasing of buildings beyond merely exercising the option to participate or not in the financial and other obligations, and in the resultant rental return. *As a colessor on leases, it acquired certain rights, well-defined in the leases, including a share of control. But as a party to the 1913 modification, it acquired no right to control the course of commercial development on lands owned by Central.*

New Haven makes the argument that if the agreement is thus construed, New Haven is at the mercy of Central. Of course, so long as the hotel was rented to a third party New Haven was no more at the mercy of Central than any mortgagee is at the mercy of a mortgagor who has the uncontrolled right to lease or not to lease and on such terms as the mortgagor sees fit. And, of course, the parties in 1913 contemplated a third-party tenant. For the ensuing 21 years, the hotel, indeed, remained rented to a third party. As a consequence it was unlikely that Central would make arrangements, or could make arrangements, with a third party, which would be harmful to New Haven without at the same time harming itself.

Once, of course, the unexpected happened, namely, that the railroads had to take over the hotel, a different situation arose. It is inferable that, because of the changed circumstance, the board of directors of the subsidiary was constituted, as earlier described, to protect the interest of New Haven, since now there was the risk, which there had not been before, of self-dealing between Central and a subsidiary. Under this consensual arrangement New Haven and Central lived without complaint for another 23 years. Notably, even now New Haven does not accuse Central of breach of faith in making the 1958 lease with its subsidiary.

There is no doubt, and Central concedes it, that New Haven, in any event, would never be at the absolute mercy of Central in the making of leases for the hotel. New Haven would always have the right to reject any lease, and refuse to join in it, if the lease were an unreasonable one* and were the fruit of faithless self-dealing by Central. Nor would New Haven have to act at its peril when confronted with such a lease. It could always

---

* I.e. If it were destructive of New Haven's right to participate in the benefits of surplus rentals, once it had acquired that right by "joining" in the construction of a building.

seek relief by way of declaratory judgment, and even in this case, as will be seen later, equity may prevent a gross and unnecessary forfeiture. Nor would New Haven's right to refuse to join in a lease be limited to leases involving faithless self-dealing. If, conceivably, Central should choose faithlessly or improvidently to make a lease for an unreasonable consideration to a third party New Haven would not have to join. The implied covenant of good faith exists in every contract (e.g., *Wigand* v. *Bachmann-Bechtel Brewing Co.*, 222 N. Y. 272, 277; *Industrial & General Trust, Ltd.* v. *Tod*, 180 N. Y. 215, 225).

Perhaps, the most telling omission in the 1913 modification, as distinguished from the particular Biltmore agreements, is the absence of any machinery for resolving an impasse between the railroads. If New Haven's contention is correct, it was entitled to share equal control, apart from particular building agreements. It borders on the inconceivable to suggest that the executives of two railroads and their legal advisers, with a history of the enterprises extending well over a half-century, would permit their companies to be subjected to deadlocks, without avenue of escape, for an indefinite future. Nor is it any answer, and the New Haven does not suggest it as an answer, that the 1907 agreement had an arbitration clause.

Even under the modern law of arbitration in order for an issue to be arbitrable it must be a justiciable one (Civ. Prac. Act, § 1448). Under the more limited arbitration law extant before 1920 it would have been even better recognized that an arbitration enforcible under the statute could not be used to make a contract, although it might have some limited usefulness in interpreting an existing one (Code Civ. Pro., § 2366). In other words, if the railroads could not agree on a lease to a third party, neither could compel arbitration of the issue at common law (which was restricted to enforcement of antecedent awards) or under the statute (which confined enforcement of agreements to arbitrate to justiciable disputes) and thus have the lease made for them.

For all the reasons thus far discussed it is concluded that New Haven has no right (at least once its advances have been fully reimbursed and it no longer has a declared "undivided interest" in the building) independent of joining in leases and other agreements affecting the premises, to share in the control and management of the Hotel Biltmore merely because it participated in the financing of its construction. As a consequence, unless it is asked to join in a lease which is corrupt, unreasonable or otherwise violates the express or implied

agreements between the parties, it has no choice but to join in the lease and the obligations of the lessors thereunder if it wishes to share in the surplus rentals.

As one views the entire relationship between the railroads in broad perspective, in the length of time and the breadth of the documents, it is evident that the issue of control is all but a chimera. So long as the written agreements, particularly the Biltmore agreements, between the railroads are extant and not annulled by substantial breach, the parties share in control as defined by those very agreements. When substantial breach occurs, if it is sufficient to work a forfeiture, then the fact of Central's ownership gives it complete control. Before that, Central's effective ownership and opportunity to take undivided control is but in the wings. Applied to the imbroglio which occurred here, the organic agreements between the parties required New Haven to join in any lease which met the minimal requirements, namely, those provided by the 1913 modification and the agreements made in connection with the construction and leasing of the Hotel Biltmore, all long before 1958. Hence, New Haven's refusal to join in the 1958 lease was at least a technical breach. The consequences of such breach, technical or substantial, are another matter.

But it does not follow that because New Haven under a mistaken notion of law refused to sign the lease in 1958 that, therefore, it should forevermore forfeit its right to the profits to be derived from the Hotel Biltmore. Indeed, it would be a sad commentary and indicative of the absence of justice in law if, after the 45 years that it took to repay the construction advances, New Haven could lose its valuable residual rights because of mistake in the absence of a showing that the mistake caused harm or other prejudice to Central. These rights are quite substantial and consist of an accumulation at the time of judgment of rental overstatements for the terminal facilities in the amount of $1,236,212.15, and a 45-percent interest in the furniture and name of the Hotel Biltmore.

Indeed, there is no express provision in the agreement for such a forfeiture. A forfeiture might arise only if there has been a substantial breach, and then there might be qualifications. Since the lease made by Central in 1958 was with its own subsidiary and it imposes no unusual obligations on the lessor, it is reasonable to assume that no prejudice has resulted thus far from New Haven's refusal to join. In consequence, equity is with power to remedy or to ignore the barely technical breach and permit New Haven, if it wishes, to now join in the 1958 lease, in the absence of a showing by Central that New

Haven's mistaken rejection of the lease caused irreparable harm and constituted a substantial breach of agreement not compensable in pecuniary damages (Restatement, Contracts, § 302, cf. § 275; 3 Williston, Contracts [Rev. ed.], § 793; 30 C. J. S., Equity, § 56).

Accordingly, I dissent in part and vote that the judgment in favor of defendant New Haven should be modified, on the law and in the exercise of discretion, to declare the rights of the parties in accordance with these views, and that judgment be granted in favor of plaintiffs on the complaint, but with leave to defendant to apply at the foot of the judgment at Special Term for appropriate directions under which it may join in the current lease for the Hotel Biltmore.

Botein, P. J., and Bergan, J., concur with Rabin, J.; Breitel, J., dissents in part in opinion in which Eager, J., concurs.

Judgment in favor of the defendant modified, on the law, by striking therefrom so much of the fifth decretal paragraph as directs the forthwith removal of those claiming under Realty and by granting leave to the defendant to apply at the foot of the judgment, if so advised, for such relief as it might deem proper in the circumstances; and as so modified affirmed, without costs. Settle order on notice.